In the Matter of Johnny Lee WARD, Jr. and Sophia Delores Ward, Debtors.

SAFEWAY FINANCE CO., INC. OF GEORGIA, Appellant,

v.

Johnny Lee WARD, Jr. and Sophia Delores Ward, Appellees.

In the Matter of Allean Delois HARRIS, f/k/a Allean Delois Reed, Debtor.

SAFEWAY FINANCE CO., INC. OF GEORGIA, Appellant,

v.

Allean Delois HARRIS, Appellee.

In the Matter of Johnnie SMALLWOOD, Jr. and Mary Smith Smallwood, Debtors.

SAFEWAY FINANCE CO., INC. OF GEORGIA, Appellant,

v.

Johnnie SMALLWOOD, Jr. and Mary Smith Smallwood, Appellees.

In the Matter of James Curtis DAVENPORT, Debtor.

SUNAMERICA FINANCIAL CORPORATION, Appellant,

v.

James Curtis DAVENPORT, Appellee.

Bankruptcy Nos. 179–00450, 180–00474, 180–00301 and 180–0037.

Civ. A. Nos. CV180–144, CV181–82, CV181–018 and CV181–014.

United States District Court, S. D. Georgia, Augusta Division.

Oct. 2, 1981.

T. J. Foss, Augusta, Ga., for appellees.

John B. Long, Augusta, Ga., for appellant.

Fred K. Harvey, Augusta, Ga., for intervenor.

## ORDER ON APPEAL

BOWEN, District Judge.

The captioned cases are on appeal from the bankruptcy court. Jurisdiction over such matters is vested in the United States District Court pursuant to 28 U.S.C. § 1334 and Title IV § 405(c) of the Bankruptcy Reform Act of 1978. The cases have been consolidated for disposition on appeal because they share one major common issue. By this order, the Court will decide this issue and two subsidiary issues presented by one or more of the appeals.

The facts are not in dispute and may be summarized as follows:

*In re Ward*

Appellee-debtors filed a joint voluntary petition for relief under Chapter 13 of the Code, 11 U.S.C. § 1301, *et seq.*, on November 26, 1979. Appellant, a creditor of appellees, filed a proof of claim on January 7, 1980, showing a present amount due of $1,803.00. Attached to the proof of claim was a combined promissory note and nonpurchase money security agreement, executed by Sophia Ward on March 19, 1979, which shows that the note was secured in part by a Whirlpool washing machine, and a financing statement showing that appellant's security interest was perfected on March 21, 1979.

The debtors did not object to appellant's claim prior to confirmation and the bankruptcy judge confirmed the plan by order entered February 28, 1980. On April 14, 1980, the debtors filed a complaint to avoid appellant's lien on the Whirlpool washing machine pursuant to 11 U.S.C. § 522(f). The bankruptcy court ruled in favor of the debtors and avoided appellant's lien.

*In re Harris*

Appellee-debtor filed a petition for relief under Chapter 13 of the Code on September 10, 1980. The plan provided in part that appellant's lien on the debtor's household goods be avoided under 11 U.S.C. § 522(f). Appellant filed its proof of claim on October 6, 1980, showing an amount claimed in the sum of $3,199.37. Attached to the proof of claim were two combined promissory notes and nonpurchase money security agreements, executed by the debtor, and a financing statement showing that appellant's security interest in the debtor's household goods was perfected on February 27, 1979.

On November 10, 1980, appellant filed objections to the confirmation of the debtor's plan, in particular the lien avoidance provision. After a confirmation hearing, the bankruptcy court confirmed the plan and avoided appellant's lien.

*In re Smallwood*

Appellee-debtors petitioned for relief under Chapter 13 of the Code on June 13, 1980. The plan provided in part that appellant's lien on the debtors' household goods be avoided under 11 U.S.C. § 522(f). Appellant filed its proof of claim on July 10, 1980, showing an amount due in the sum of $3,328.00, and contemporaneously filed objections to confirmation of the debtors' plan. Attached to the proof of claim were three combined promissory notes and nonpurchase money security agreements.

The first note and security agreement, dated July 7, 1978, granted appellant a se-

curity interest in all of the debtors' household goods, as itemized in a "Schedule A." The security interest was perfected by the filing of a financing statement on July 10, 1978. The second combined note and security agreement, dated January 8, 1979, was a renewal of the July 7, 1978 loan contract. New money was advanced in the amount of $535.86 and the debtors reassumed a net amount of payoff of $1,806.85. This second note was secured, in part, by the same household goods which secured the July 7, 1978 note. The January 8, 1979 loan contract was renewed on December 14, 1979, at which time $239.10 was advanced and the net payoff assumed was $2,055.20. The same household goods, as described in the attached "Schedule A," were retained as collateral. All of the security agreements provided that the security interest was granted to "secure this loan and any extension, or refinancing thereof and any future advances made at the option of the secured party to or for the account of the debtor."

By order entered December 16, 1980, the bankruptcy court confirmed the debtors' plan and avoided appellant's lien pursuant to section 522(f). Specifically, the court found that, upon the subsequent executions of the renewal notes and security agreements, a novation occurred. Thus, the operative promissory note and security agreement, at the time the debtors filed for Chapter 13 relief, was the December 14, 1979 loan contract. The court concluded that since this note and security agreement was executed after the enactment of the Reform Act, the lien avoidance provision of section 522(f) could be constitutionally applied.

*In re Davenport*

On December 4, 1979, appellee-debtor petitioned the bankruptcy court for relief under Chapter 13. The plan as filed did not provide for lien avoidance under section 522(f). Appellant filed its proof of claim as a secured creditor claiming as the amount due $1,890.00. Attached to the proof of claim was a combined note and security agreement, dated August 13, 1979, which granted appellant a security interest in the debtors' household goods. After confirmation of the plan, the debtor filed an adversary proceeding seeking to avoid appellant's lien.

Appellant answered the debtor's complaint to avoid the lien and filed an amended proof of claim. The amendment showed that the August 13, 1979 loan contract was a renewal of previous loan contract, dated November 8, 1978, in which the same collateral was taken as security. The security interest was perfected by the filing of a financing statement on November 9, 1978.

The amended proof of claim further showed that, prior to the November 8, 1978 loan contract, the debtor entered into a retail installment contract with K-Mart to purchase an RCA color television on December 30, 1976, and that the contract was assigned to appellant. At the time of the November 8, 1978 direct loan to the debtor, the balance due on the retail installment contract was $149.59. The loan amount of the note financed was $1,573.79. Of that amount, $580.24 was lent to the debtor, from which the debtor paid appellant the balance due of $149.59. The security agreement and concomitant financing statement showed that the RCA color television was part of the collateral taken in connection with the November 8, 1978 loan.

By order entered December 11, 1980, the bankruptcy court avoided appellant's lien pursuant to section 522(f). The court concluded that, upon the execution of the November 8, 1978 loan contract, a novation of the December 30, 1976 contract occurred. Accordingly, the court found that the 1978 contract novation discharged the 1976 indebtedness and altered the security interest in the television from "purchase money" to "nonpurchase money."

I

A common general issue presented in the *Davenport* and *Smallwood* appeals is whether, for purposes of section 522(f), the security interest in question was a nonpurchase money security interest which vested *after* the enactment date of the Reform Act on November 6, 1978. Specifically, the rele-

vant inquiry in *Davenport* is whether appellant's purchase money security interest in the RCA color television was extinguished upon the execution of the November 8, 1978 note which refinanced the balance due on the retail installment contract and advanced additional sums to the debtor, and which was secured by the debtor's household goods including the television. In *Smallwood*, the issue is whether (1) the January 8, 1979 note which provided for a net payoff of the July 7, 1978 note and advanced new sums to the debtors, and which was secured in part by the same household goods which secured the prior note, and (2) the December 14, 1979 note which provided for a net payoff of the debtors' prior balance and advanced new sums to the debtors, and which was secured by the same household goods, may be viewed as entirely new loans.

With respect to *Davenport* a brief recapitulation of the facts should be made for purposes of clarity. Appellant was assigned the 1976 retail sales contract for the television by the seller. At the time of this assignment, appellant held a purchase money security interest in the television set. Thereafter, this account was refinanced by the execution of a promissory note and security agreement on November 8, 1978. From the amount financed in this loan, appellant received the balance due on the sales contract and the debtor was advanced new credit. As collateral, appellant took a security interest in the debtor's household goods, including the television, which was perfected on November 9, 1978.

■ Under the Uniform Commercial Code, Ga.Code § 109A–9–107(b), a security interest is a *purchase money* security interest "to the extent that it is . . . taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." Here, the November 8, 1978 note did not enable the debtor to acquire rights in or the use of the television. The net cash received by the debtor in the amount of $325.24 did not endow him with new rights in the tele-

vision, nor did the debtor acquire additional rights upon the refinancing of his prior account. Thus, the purchase money character of the original lien on the television, appurtenant to the assigned retail sales contract, was extinguished upon the refinancing of the prior account and the advancement of new credit. *See In re Jones*, 5 B.R. 655, 656 (Bkrtcy.M.D.N.C.1980).

A review of *Jones, supra*, in which the bankruptcy court considered facts analogous to the facts in this case, reveals additional elements in appellant's subsequent loan transaction which support the conclusion that the November 8, 1978 combined note and security agreement effected a new nonpurchase money security interest in the television. To begin with, the fact that appellant filed a financing statement on November 9, 1978, listing the television as part of the property covered, "indicates that [it] questioned the purchase money character of the transaction." *Id.* at 657.

Secondly, "the purchase money character of the security interest [in the television for the assigned sales contract] was extinguished when the proceeds from the [promissory note] were used to satisfy the [prior account]." *Id.* As stated in the Official Comments to the Uniform Commercial Code:

> When a purchase money interest is claimed by a secured party who is not a seller, he must of course have given present consideration . . . . [T]he purchase money party must be one who gives value "by making advances or incurring an obligation": The quoted language excludes from the purchase money category and [*sic*] security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt.

*Id.* (quoting Official Comment 2 of U.C.C. § 9–107). Since the security interest in the debtor's household goods, including the television, held under the November 8, 1978 loan, was taken, in part, as security for satisfaction of the antecedent debt under the assigned sales contract, it is excluded from the purchase money category. In sum, after the execution of the November

8, 1978 combined note and security agreement and upon the filing of a financing statement on November 9, 1978, appellant held a perfected nonpurchase money security interest in the debtor's RCA color television and other household goods. Thus, the pertinent time frame for the application of section 522(f) is subsequent to the enactment date of the Reform Act.

With respect to *Smallwood*, it is once again helpful, for purposes of clarity, to restate briefly the pertinent facts. On July 7, 1978, the parties executed a combined note and security agreement. As collateral, appellant took a security interest in the debtors' household goods, which were listed in an attached "Schedule A." This note was "renewed" and new credit was extended to the debtor upon the execution of a new combined note and security agreement on January 8, 1979. Attached to the security agreement was a "Schedule A," dated January 8, 1979, which listed the same collateral that secured the prior note. On December 14, 1979, the second note was "renewed"[1] and new credit was extended to the debtors by the execution of a third combined note and security agreement. Once again, an attached "Schedule A," dated December 14, 1979, listed the same household goods as collateral; however, the

stated value of the household goods was raised by $1,000.00. Each of the three security agreements contained a "future advances" clause.

■ Although appellant contends that the security interest appurtenant to the July 7, 1978 combined note and security agreement continued in effect throughout the execution of the two new notes and security agreements, the Court adopts the holding of the bankruptcy judge that the subsequent loan contracts constitute a novation of the July 7, 1978 contract. The bankruptcy court concluded:

> In order that there may be a novation of a contract, it must be shown that another contract containing other and different terms from the original has been agreed upon, and that there was consideration. *Collier Estate v. Murray*, 145 Ga. 851 [90 S.E. 52]. This is evidenced in the case *sub judice* where the January, 1979, loan contract provided more security (an automobile) than the original contract, introduced a new security agreement, [advanced new sums to the debtors], increased the amount financed by approximately $700.00, and increased the total of the Debtors' payments by more than $1,000.00.

1. Both the bankruptcy court and appellant refer to the subsequent notes as renewals of a prior note. It appears, however, that under Georgia law the subsequent notes may not be strictly termed renewals. In *King v. Edel*, 69 Ga.App. 607, 26 S.E.2d 365 (1943), the Georgia Court of Appeals described a renewal note as follows:

   "As applied to promissory notes, the term 'renewal' has been held to mean 'the re-establishment of the particular contract for another period of time.' It has also been held that there might be such a thing as a renewal where the party was different, provided the obligation was of the same nature .... Not only the definition of renewal, but also its application ..., carries the idea that an obligation is renewed when the same obligation is carried forward by the new paper or undertaking, whatever it may be. There may be a change of parties. There may be an increase of security, *but there is no renewal unless the obligation is the same*. What makes the renewal is an extension of time in which to discharge the obligation. If the obligation

   changes, there can be no renewal, because there can be no such thing as the re-establishment of an old obligation by the creation of a new obligation different in character." *Id.* at 611–12, 26 S.E.2d 365 (quoting *Lowry Nat. Bank v. Fickett*, 122 Ga. 489, 492, 50 S.E. 396 (1905) (emphasis added); *see American Surety Co. v. Garber*, 114 Ga.App. 532, 151 S.E.2d 887 (1966). *See also Citizens & Southern National Bank v. Scheider*, 139 Ga.App. 475, 476–77, 228 S.E.2d 611 (1976) ("A new note given in lieu of an existing note between the same parties and for the same indebtedness, even at a higher rate of interest and due at a later date, is not given for a new consideration, and therefore does not constitute a novation."); *Davis v. Dunn*, 74 Ga. 36, 37 (1884) ("transaction was not a novation, but the mere renewal of the old note.").

   Under the subsequent notes in this case, new money was advanced to the debtors and thus the obligation of the prior note did not remain the same. Hence, the January 8, 1979 note and the December 14, 1979 note do not conform with the above-quoted definition of a "renewal" note.

*In re Smallwood*, No. 180–00301 (Bkrtcy.S. D.Ga. Dec. 16, 1980). *See also Chewing v. Huebner*, 142 Ga.App. 112, 113, 235 S.E.2d 573 (1977) ("An existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject matter embraced by the original contract.").

The future advance clause in the July 7, 1978 security agreement does not alter the conclusion that a novation occurred. While "Georgia courts have long recognized and enforced 'future advance' schemes in . . . security instruments to effectuate a cross collateralization of previously granted security interests to indebtedness thereafter arising," *Barksdale v. Peoples Financial Corp.*, 393 F.Supp. 112, 119 (N.D.Ga.1975), *rev'd on other grounds*, 543 F.2d 568 (1976) *vacated and remanded to panel*, 571 F.2d 948 (*en banc*), *aff'd on remand*, 578 F.2d 1185 (5th Cir. 1978), and such a provision in a security agreement is sanctioned under the Uniform Commercial Code, Ga.Code § 109A–9–204(5), the appellant did not rely on the future advance clause to secure the subsequent promissory notes, but instead required the debtors to execute a new security agreement covering the same collateral. The clear intent of the parties, upon entering into the subsequent loan contracts, was that the contemporaneously executed security agreements entirely superseded the initial security agreement. Thus, the operative security interest, for purposes of section 522(f), vested subsequent to the enactment date of the Reform Act. *See generally In re Alston*, 11 B.R. 184 (Bkrtcy.W.D. Tenn.1981) (series of refinanced or "flipped" loans treated as entirely new loans in the context of section 522(f) lien avoidance); *In re Carnes*, 8 B.R. 599 (Bkrtcy.W.D.Okl.1981) (renewal note and security agreement executed subsequent to Code's effective date held avoidable even

though security interest was originally created before Code's effective date).

## II

█ In both *Ward* and *Davenport*, the debtors brought an adversary proceeding seeking to avoid appellants' liens *after* the respective Chapter 13 plans had been confirmed. On appeal, appellants argue that, since under 11 U.S.C. § 1327(a) "[t]he provisions of a confirmed plan bind the debtor and each creditor," a post-confirmation lien avoidance is improper.

This argument is without merit. To begin with, section 522(f) prescribes no time limit in which the debtor must act to avoid the creditor's lien or else forego the exemptions to which he is otherwise entitled. Furthermore, the preclusion of post-confirmation lien avoidance would frustrate one of the primary objectives of the Bankruptcy Act: "to enable the bankrupt to 'make an unencumbered fresh start'." *In re Turpin*, 644 F.2d 472, 474 (5th Cir. 1981) (quoting *Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966)). Engrafting time constraints on the section 522(f) lien avoidance provision, when not expressly mandated by Congress, would artificially curtail the debtor's statutory right to preserve his allowable exemptions and to realize an "unencumbered fresh start."

## III

The common issue presented by these consolidated appeals is whether the application of 11 U.S.C. § 522(f)(2)(A) to avoid nonpossessory, nonpurchase money security interests in household goods, which were created in the interim period between enactment of the Bankruptcy Reform Act of 1978 and its effective date, constitute a taking of rights in property in violation of the fifth amendment.[2] Pursuant to 28

---

**2.** There are numerous reported cases considering the constitutionality of § 522(f) as applied to particular fact situations. A review of these decisions reveals a great divergence of opinions. Several courts have found the lien avoidance provision of § 522(f) unconstitutional as applied to security interests which vested prior

to the enactment date of the Bankruptcy Reform Act on November 6, 1978. *See Rodrock v. Security Indus. Bank*, 642 F.2d 1193 (10th Cir. 1981); *In re Lovett*, 11 B.R. 123 (W.D.Mo. 1981); *In re Baker*, 11 B.R. 125 (Bkrtcy.W.D. Mo.1981) (holding in part); *In re Carroll*, 11 B.R. 45 (Bkrtcy.E.D.N.Y.1981); *In re Bailey*, 10

U.S.C. § 2403, the Attorney General of the United States was afforded an opportunity to intervene in this constitutional challenge to section 522(f)(2)(A), but declined.[3]

Before considering the specific constitutional challenge at issue, certain guiding principles, which structure the general framework for deciding constitutional questions, should be noted. To begin with, "[i]t is by now well established that legislative Acts adjusting the burdens and benfits of economic life come to the Court with a presumption of constitutionality." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Complementing this maxim, is the cardinal rule that courts should " 'first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided'." *Wright v. Vinton Branch*, 300 U.S. 440, 461, 57 S.Ct. 556, 561, 81 L.Ed. 736 (1937) (quoting *Crowell v.*

*Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–297, 76 L.Ed. 598 (1932)).

■ When the constitutionality of a statute is challenged and the issue is actually reached by the Court, the burden of proof rests with the party asserting the challenge. *Metropolitan Casualty Insurance Co. v. Brorwell,* 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935). Several courts have suggested that this burden is particularly heavy in a trial court, since such constitutional determinations "would seem to lie peculiarly within the domain of appellate courts unless the defect in the statute is crystalline." *In re Pommerer*, 10 B.R. 935, 946 (Bkrtcy.D.Minn.1981) (citing *Thompson v. United States*, 148 F.Supp. 910 (E.D.Pa. 1957)). Yet, whether at the trial or appellate court level, it is apparent that "[a] constitutional challenge to legislation duly enacted by Congress is a matter of grave concern and must be approached in a manner commensurate with its magnitude." *In*

B.R. 567 (Bkrtcy.E.D.Tenn.1981); *In re Parker*, 10 B.R. 562 (Bkrtcy.M.D.Ala.1981); *In re Bibb*, 10 B.R. 40 (Bkrtcy.E.D.Mich.1981) (holding in part); *In re Sams*, 9 B.R. 479 (Ekrtcy.N.D.Ohio 1981); *In re Hammer*, 9 B.R. 343 (Bkrtcy.N.D. Iowa 1981); *In re Schulte*, 8 B.R. 12 (Bkrtcy.D. Kan.1980); *In re Oldham*, 7 B.R. 124 (Bkrtcy.D. N.M.1980); *In re Pierce*, 4 B.R. 671 (Bkrtcy.W. D.Okl.1980); and *In re Hawley*, 4 B.R. 147 (Bkrtcy.D.Or.1980). In contrast, the following court held that § 522(f) is constitutional as applied to security interests created prior to November 6, 1978: *In re Paden*, 10 B.R. 206 (Bkrtcy.E.D.Pa.1981); *In re Stump*, 8 B.R. 516 (Bkrtcy.D.S.D.1981); *In re Campbell*, 8 B.R. 425 (Bkrtcy.S.D.Ohio 1981); *In re Pillow*, 8 B.R. 404 (Bkrtcy.D.Utah 1981); *In re Joyner*, 7 B.R. 596 (Bkrtcy.M.D.Ga.1980); *In re Goodrich*, 7 B.R. 590 (Bkrtcy.S.D.Ohio 1980); *In re Augustine*, 7 B.R. 565 (Bkrtcy.W.D.Pa.1980) (United States as creditor); *In re Brown*, 7 B.R. 264 (Bkrtcy.N.D.Tx.1980) (holding in part); *In re Middleton*, 7 B.R. 3 (Bkrtcy.N.D.Ga.1980); *In re Primm*, 6 B.R. 142 (Bkrtcy.D.Kan.1980) (holding in part); *In re Curry*, 5 B.R. 282 (Bkrtcy.N. D.Ohio 1980); *In re Ambrose*, 4 B.R. 395 (Bkrtcy.N.D.Ohio 1980). As applied to security interest created in the so-called "gap" period, between the enactment date of the Bankruptcy Reform Act, November 6, 1978, and the effective date of the Act, October 1, 1979, section 522(f) has been found constitutional by the following courts: *In re Cohn*, 11 B.R. 611 (Bkrtcy.D.Mass.1981); *In re McClaflin*, 11 B.R. 355 (Bkrtcy.N.D.Ill.1981); *In re Baker*, 11 B.R. 125 (Bkrtcy.W.D.Mo.1981) (holding in part); *In re Pommerer*, 10 B.R. 935 (Bkrtcy.D.Minn.

1981); *In re Fennell*, 9 B.R. 340 (Bkrtcy.D.Idaho 1981); *In re Teske*, 9 B.R. 18 (Bkrtcy.E.D. Mich.1981); *In re Wells*, 7 B.R. 875 (Bkrtcy.D. Colo.1980); *In re Sweeney*, 7 B.R. 814 (Bkrtcy.E. D.Wis.1980); *In re Webber*, 7 B.R. 580 (Bkrtcy. D.Or.1980); *In re Seltzer*, 7 B.R. 80 (Bkrtcy.D. Colo.1980); *In re Bradford*, 6 B.R. 741 (D.Nev. 1980) (judicial lien); *In re Primm*, 6 B.R. 142 (Bkrtcy.D.Kan.1980) (holding in part); *In re Beck*, 4 B.R. 661 (Bkrtcy.C.D.Ill.1980); *In re Head*, 4 B.R. 521 (Bkrtcy.D.Tenn.1980); *In re Steinart*, 4 B.R. 354 (Bkrtcy.W.D.La.1980); *In re Rutherford*, 4 B.R. 510 (Bkrtcy.S.D.Ohio 1980). Cases which have held section 522(f) unconstitutional as applied to gap security interests include: *In re Harris*, 12 B.R. 132 (Bkrtcy.S.D.Ohio 1981); *In re Harth*, 12 B.R. 109 (Bkrtcy.W.D.Okl.1981); *In re Johnson*, 11 B.R. 909 (Bkrtcy.D.Kan.1981); *In re Bibb*, 10 B.R. 40 (Bkrtcy.E.D.Mich.1981) (holding in part); *In re Groves*, 9 B.R. 775 (Bkrtcy.D.Colo. 1981); and *In re Lucero*, 4 B.R. 659 (Bkrtcy.D. Colo.1980) (judicial lien). Finally, in the few reported cases which have reached the issue, section 522(f) has been held constitutional as applied to security interests created after the effective date of the Bankruptcy Reform Act. See *In re Alston*, 11 B.R. 184 (Bkrtcy.W.D. Tenn.1981); *In re Sweeney*, 7 B.R. 814 (Bkrtcy. E.D.Wis.1980) (holding in part).

**3.** The constitutional issue presented here has been stated as narrowly as possible in keeping with precedential concepts of judicial restraint.

*re Goodrich*, 7 B.R. 590, 592 (Bkrtcy.S.D. Ohio 1980).

### Section 522(f) lien avoidance

Historically, the bankruptcy laws have exempted certain debtor property from attachment by creditors. *See generally* 3 *Collier on Bankruptcy* ¶ 522.01, at 522–8 (15th ed. 1981). Under section 6 of the Act of 1898, as amended by the Act of 1938, 11 U.S.C. § 24 (1970), allowable exemptions were determined by applicable state law. In reviewing the varied state law exemptions available under this Act, depending on the bankrupt's domicile, the drafters of the Bankruptcy Reform Act of 1978 recognized that many such exemptions had little relevance to the modern debtor. As the Report from the House Committee on the Judiciary states:

> Most [state exemption laws] are outmoded, designed for more rural times, and hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors. The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. The purpose has not changed but neither have the level of exemptions in many States. Thus, the purpose has largely been defeated.

H.R.Rep.No.595, 95th Cong., 1st Sess. 126 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6087. Congress sought to remedy this disparate and often antiquated system of state law exemptions by prescribing certain federal exemptions in the present Act. 11 U.S.C. § 522(b), (d). At the same time, however, Congress perceived that "circumstances do vary in different parts of the country," H.R.Rep.No.595, at 126, 6087, and thus debtors are now allowed to choose between the applicable state exemptions and the federal exemptions. 11 U.S.C. § 522(b)(2)(A).

The choice of exemption systems available under section 522(b) marks a "significant departure from [prior] law." H.R.Rep. No.595, at 372. Essentially, the debtor must now elect the section 522(d) federal exemptions or, in the alternative, choose exemptions available under other federal statutes, *e. g.* veterans benefits, 45 U.S.C. § 352(E), and the law of the state of his domicile; "he may not selectively choose those exemptions which most suit his needs." 3 *Collier on Bankruptcy, supra,* ¶ 522.02, at 522–11. This statutory choice of exemptions, however, may be vetoed by state law, which, pursuant to 11 U.S.C. § 522(b)(1), may proscribe the availability of section 522(d) federal exemptions. The State of Georgia has enacted such a statute.[4]

The lien avoidance provision of section 522(f) [5] was enacted to preserve the debtor exemptions provided by section 522(b) against certain creditor interests. *See generally* 3 *Collier on Bankruptcy, supra,* ¶ 522.29. The legislative intent underpinning subsection (f), and the prescribed enforcement mechanism to realize that intent, was summarized in the House Report as follows:

---

4. Ga.Code Ann. § 51–1601 (Cum Supp.1981) (effective April 7, 1981). Thus, individual debtors, "domiciled in Georgia," may not choose the federal exemptions available under 11 U.S.C. § 522(d). This "opting-out" does not affect the debtor's lien avoidance power under section 522(f). *See* 3 *Collier on Bankruptcy* ¶ 522.29[1], at 522–69.

5. Section 522(f) provides in full:

> Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have

been entitled under subsection (b) of this section, if such lien is—

(1) a judicial lien; or

(2) a nonpossessory, nonpurchase-money security interest in any—(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor.

Subsection (f) protects the debtor's exemptions, his discharge and thus his fresh start by permitting him to avoid certain liens on exempt property. The debtor may avoid a judicial lien on any property to the extent that the property could have been exempted in the absence of the lien, and may similarly avoid a nonpurchase-money security interest in certain household and personal goods. The avoiding power is independent of any waiver of exemptions.

H.R.Rep.No.595, at 362, 6318. As the Report indicates, subsection (f) comports with the "fresh start" concept attendant to section 522(b) exemptions, since without the ability to avoid certain encumbrances on exempt property, "the debtor would be left financially fresh but without a start." *In re Pommerer*, 10 B.R. 935, 946 (Bkrtcy.D. Minn.1981).

At issue in these appeals is the debtor's right to avoid nonpossessory, nonpurchase-money security interests to the extent such interests impair allowable exemptions for household furnishings, goods and appliances. 11 U.S.C. § 522(f)(2)(A). In enacting subsection (f)(2)(A), Congress found that security interests in household belongings were often used by overreaching creditors to acquire an unfair advantage over debtors. *See* H.R.Rep.No.595, at 127. A frequent scenario was as follows: The creditor lent money to an individual debtor and, in return, the debtor executed a security interest in his household property in favor of the creditor and often signed a boilerplate waiver of statutory exemptions. The

creditor recognized that, because of high retail mark-up, as well as present depreciation, the debtor's household goods had little, if any, resale value. Thus, actual foreclosure in the event of default was economically impracticable, and, in fact, was never intended.[6] Instead, upon the debtor's default, the creditor utilized the threatened possibility of seizure and sale as a means to coerce the debtor into making payments. Similarly, since the debtor could ill-afford to replace the household property subject to the lien, the creditor realized that the threat of foreclosure was a viable lever to secure refinancing of the loan, anticipatory reaffirmation of the debt prior to any bankruptcy proceedings, or reaffirmation after discharge in bankruptcy. *See generally* H.R.Rep.No.595, at 127–27; *id.* at 150–51 (remarks of David H. Williams, Attorney, Division of Special Projects, Bureau of Consumer Protection, Federal Trade Commission).

Section 522(f) forestalls such a scenario by enabling "the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed to undo the consequences of a contract of adhesion, signed in ignorance, by permitting the invalidation of nonpurchase money security interest in household goods." H.R.Rep.No.595, at 127, 6088. Thus, the permissible property exemptions are realized to their full value and the "fresh start" following bankruptcy is attained.

*Retroactive effect*

A retroactive statute is one "which takes away or impairs vested rights acquired un-

---

**6.** The reported experience of one bankruptcy court with creditors holding both a nonpurchase money security interest on the debtor's household goods, as well as a second mortgage on the debtor's residence, lends credence to the conclusion that foreclosure on the former security interest is never actually intended. Bankruptcy Judge White commented:

It has been the experience of this court that creditors holding nonpurchase-money security interest on all of the debtor's household goods and a second mortgage on the debtor's residence release such liens on household goods when they become aware that the debtor is about to file a petition under Chapter 13 of the Bankruptcy Code. Under 11

U.S.C. § 1322(b)(2), a Chapter 13 Plan may "modify the rights of holders of secured claims *other than* a claim secured *only* by a security interest in real property that is the debtor's principal residence . . . ." Thus, the creditors release their liens on debtor's household goods in an attempt to take away the debtors' ability to modify their rights under the provisions of a Chapter 13 Plan. This course of action by creditors lends support to the insight of Congress that holders of nonpurchase-money security interests on household goods rarely repossess.

*In re Curry*, 5 B.R. 282, 290 (Bkrtcy.N.D.Ohio 1980) (emphasis in original).

der existing laws, or creates a new obligation, imposes a new duty or attaches a new disability, in respect to transactions or considerations already past."[7] 16A Am.Jur.2d *Constitutional Law* § 661, at 641 (1979). As a general rule of construction, " 'legislation must be considered as addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be the unequivocal and inflexible import of the terms, and the manifest intention of the legislature'." *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964) (quoting *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). Thus, the issue whether section 522(f) has retroactive application turns on a determination of legislative intent. *See Hassett v. Welch*, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938).

This determination presents certain unique considerations with respect to these bankruptcy appeals because, unlike most statutes, the enactment date and the effective date of section 522(f) are not one in the same. Several courts addressing this question have concluded that, where the pertinent property interest vested after the Code's enactment date but before its effective date, lien avoidance pursuant to section 522(f) "is not a genuine retrospective application of law." *In re Pommerer*, 10 B.R. 935, 947 (Bkrtcy.D.Minn.1981). *See, e. g., In re Teske*, 9 B.R. 18 (Bkrtcy.W.D.Mich. 1981); *In re Webber*, 7 B.R. 580 (Bkrtcy.D. Or.1980); *In re Seltzer*, 7 B.R. 80, 83 (Bkrtcy.D.Colo.1980); *In re Head*, 4 B.R. 521 (Bkrtcy.D.Tenn.1980). A common rationale in these decisions is that section 522(f) was in existence, although not in effect, at the time the security interest attached, and thus the lien avoidance provision was necessarily incorporated into the security agreement and the creditor was properly charged with notice of the provision. Hence, the application of section

522(f) is more closely prospective than retrospective. *See In re Pommerer*, 10 B.R. at 947; *In re Seltzer*, 7 B.R. at 82. *See also In re Webber*, 7 B.R. at 584 ("Any effect on security interests created after [the Code's enactment date] was a *pro* spective not a *retro* spective, effect.").

This Court agrees with the notion implicit in these cases that post-enactment security interests should be accorded an analysis distinct from preenactment security interests in determining the constitutionality of section 522(f) as applied. Yet, this distinction does not obviate the need to decide first whether or not Congress intended section 522(f) to reach security interests created prior to the effective date of the Reform Act. Perhaps some confusion over the retroactive effect *vel non* of section 522(f) simply demonstrates "the inherent elusiveness of the concept of retroactivity." *In re Hoops*, 3 B.R. 635 (Bkrtcy.D.Colo.1980), aff'd sub nom., *Rodrock v. Security Indus. Bank*, 642 F.2d 1193 (10th Cir. 1981).

Courts which have applied section 522(f) to creditors' interests created prior to the Reform Act's effective date have advanced the following reasons in support of retrospective application: (1) bankruptcy statutes have historically applied to creditors' interest which precede the statutes' enactment dates, *see In re Woods*, 9 B.R. 325, 327 (Bkrtcy.E.D.Mich.1981); *In re Pillow*, 8 B.R. 404, 406 (Bkrtcy.D.Utah 1981); (2) the transition sections of the Act, Pub.L.No.95–598, §§ 401–403, 92 Stat. 2682, require retrospective operation, *see Rodrock v. Security Indus. Bank*, 641 F.2d 1193, 1196–97 (10th Cir. 1981); *In re Pommerer*, 10 B.R. 935, 943 (Bkrtcy.D.Minn.1981); *In re Hammer*, 9 B.R. 343, 346–49 (Bkrtcy.N.D.Iowa 1981); *In re Stump*, 8 B.R. 516, 520–21 (Bkrtcy.D. S.D.1981); and (3) the policy reasons underlying the section 522(b) exemption provision and the companion section 522(f) lien avoidance provision compel retroactive application. *See In re Hammer*, 9 B.R. at 347; *In*

---

**7.** It should be noted that "[l]iterally defined, a retrospective law is a law which looks backward or on things that are past; a retroactive law is one which acts on things that are past.

In common use, as applied to statutes, the two words are synonymous ...." 82 C.J.S. *Statutes* § 412, at 980 (1953).

*re Pillow*, 8 B.R. at 407. Of these rationales, an examination of the transition sections prescribed in Title IV of the Act, as well as an appreciation of the "fresh start" concept inherent in section 522, provides the most forceful argument favoring retroactivity.

Section 401(a) of Title IV provides that all laws relating to bankruptcy are repealed and effectively replaced by the Reform Act of 1978. Section 402(a) states that, except as otherwise provided in Title IV, the Reform Act shall take effect on October 1, 1979. *See generally* 1 *Collier on Bankruptcy* ¶ 7.02 (15th ed. 1980). Thus, the combined effect of sections 401(a) and 402(a) is to repeal all prior bankruptcy laws as of October 1, 1979, the same date the new law became effective. The "savings provision," section 403(a), establishes that cases commenced under the prior bankruptcy law, that is petitions filed before October 1, 1979, shall be procedurally and substantively governed under the old law, "just as though the 1978 legislation had not been enacted." 1 *Collier on Bankruptcy, supra*, ¶ 7.03, at 7–16. Similarly, since the prior bankruptcy law was repealed on October 1, 1979, the effective date of the new Act, cases commenced on or after October 1, 1979, shall be controlled by the 1978 Code.

■ Given this legislative framework for transition, it is apparent that as to bankruptcy cases commenced on or after October 1, 1979, Congress intended the procedural and substantive provisions of the Reform Act to apply to creditors' interests created both prior to the Act's effective date and its date of enactment. Since, as of October 1, 1979, no other bankruptcy law was in effect but the Reform Act, the Act must of necessity govern prior-created creditors' interests. Otherwise, for petitions commenced on or after the effective date of the 1979 Code, no bankruptcy law would be applicable to such interests. Congress could not have intended such a "no-man's land." *Rodrock v. Security Indus. Bank*, 642 F.2d at 1197; *see In re Hammer*, 9 B.R. at 348–49. Thus, the unavoidable conclusion is that Congress intended section 522(f) to apply retrospectively.

A mandate for retroactive effect is also manifest in the legislative intent appurtenant to section 522(f). Certainly, Congress perceived that most bankruptcy proceedings in the first several years subsequent to the effective date of the Reform Act, if not longer, would bear upon debtor-creditor relations accruing prior to October 1, 1979. If section 522(f) were to apply prospectively only, then the abuses intrinsic in nonpurchase-money security interests in household possessions, as congressionally discerned, would linger for an indefinite period after Congress had acted to remedy the problem. Moreover, prospective application would effectively delimit a debtor's entitlement to exemptions which would otherwise be realized through lien avoidance. Thus, debtors filing petitions on or after October 1, 1979, which in the majority of proceedings would relate to debts acquired prior to the Reform Act's effective date, would be denied the benefit of a "fresh start" to the full extent intended by Congress. It is evident, therefore, that without the retroactive operation of section 522, including the lien avoidance authority prescribed in section 522(f), the fresh start concept, one of the central policy aspects of the Reform Act, would be significantly diluted.

*Constitutional as applied*

Article I, Section 8, Clause 4 of the Constitution provides that Congress shall have the power "to establish . . . uniform laws on the subject of bankruptcies throughout the United States." Generally, this authority on the "subject of bankruptcies," although "incapable of final definition," *Wright v. Union Central Ins. Co.*, 304 U.S. 502, 513, 58 S.Ct. 1025, 1031, 82 L.Ed. 1490 (1938), "includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property." *Hanover National Bank v. Moyses*, 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902). Pursuant to this power, Congress, unlike state legislatures, "may operate collaterally or incidentally to impair or destroy the obligation of private contracts." *Continental Illinois National Bank & Trust Co. v.*

*Chicago,* 294 U.S. 648, 680, 55 S.Ct. 595, 608, 79 L.Ed. 1110 (1935). *See also Kuehner v. Irving Trust Co.,* 299 U.S. 445, 452, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937) ("While . . . the Fifth Amendment forbids the destruction of a contract it does not prohibit bankruptcy legislation affecting the creditor's remedy for its enforcement against the debtor's assets, or the measure of the creditor's participation therein, if the statutory provisions are consonant with a fair, reasonable, and equitable distribution of those assets.").

As discussed earlier, bankruptcy legislation has historically operated to affect creditors' interests which accrued prior to the effective date of the legislation. *See Wright v. Union Central Ins. Co.,* 304 U.S. at 516, 58 S.Ct. at 1033; *In re Hoops,* 3 B.R. 635, 637 (Bkrtcy.D.Colo.1980), *aff'd sub nom., Rodrock v. Security Indus. Bank,* 642 F.2d 1193 (10th Cir. 1981). Yet, such retroactivity, in itself, does not render the statute unconstitutional. "Were it otherwise the paramount powers of Congress could be nullified by 'prophetic discernment'." *Fleming v. Rhodes,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947). *Cf.* U.S.Const. art. I, § 10, cl. 1 (ex post facto clause which applies to criminal statutes). Instead, as established by the Supreme Court in *Louisville Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935), constitutional constraints on the retroactive effect of bankruptcy legislation are presented by the "due process" and "taking" clauses of the fifth amendment. Thus, in considering whether section 522(f), as applied to post-enactment security interests, transgresses a fifth amendment proscription, the obligatory, although not dispositive, starting point is the oft-cited *Radford* decision.

In *Radford,* the Supreme Court held that section 75(s) of the Frazier-Lemke Act of 1934 was unconstitutional. Briefly stated, the Act enabled an insolvent farm mortgagor to: (1) obtain a five-year stay of state foreclosure proceedings, (2) retain possession of the farm upon the payment of a reasonable rent, and (3) purchase the property, unencumbered by the mortgage, with-in the five-year period by paying the mortgagee the judicially appraised value of the property. *See id.* at 592–93, 55 S.Ct. at 864–865. Writing for the Court, Justice Brandeis was careful to note that the issue before him was not "whether the bankruptcy clause confers upon Congress generally the power to abridge the mortgagee's rights in specific property," *id.* at 589, 55 S.Ct. at 863, but rather centered on "the taking of substantive rights in specific property acquired by the Bank prior to the Act." *Id.* at 590, 55 S.Ct. at 863. As thus narrowed, "[t]he province of the Court [was] limited to deciding whether the Frazier-Lemke Act as applied has taken from the Bank without compensations, and given to [the mortgagor] rights in specific property which are of substantial value." *Id.* at 601, 55 S.Ct. at 868.

Prior to the enactment of section 75(s), the Court discerned that, under state law, the mortgagee held five specific property rights in the mortgaged property. *Id.* at 594–95, 55 S.Ct. at 865–866. After the changes in the position of the mortgagee wrought by the Frazier-Lemke Act, however, "the only right under the mortgage left to the Bank [was] the right to retain its lien until the mortgagor, sometime within the five-year period, [chose] to release it by paying the appraised value of the property." *Id.* at 596, 55 S.Ct. at 866. The Court determined that such a deprivation of specific property rights violated the fifth amendment, and concluded as follows:

> For the Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

*Id.* at 602, 55 S.Ct. at 869.

*Radford* has generated considerable debate and no small amount of confusion.

The confusion emanates in part, from the vacillatory characterization of the *Radford* analysis in subsequent Supreme Court decisions. On the one hand, the Court has indicated that *Radford* was grounded on substantive due process, *Wright v. Vinton Branch*, 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736 (1937), while on the other hand, the Court has stated that *Radford* held that the mortgagee's "property had been taken without just compensation in violation of the Fifth Amendment." Whether *Radford* was premised on a substantive due process analysis or a taking analysis is significant because of the subsequent erosion of substantive due process as a viable avenue of judicial review. *See In re Pommerer*, 10 B.R. 935, 945 (Bkrtcy.D. Minn.1981). *See generally Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

The debate fomented by *Radford* focuses on the continued vitality of its reasoning in the context of present-day lien avoidance sanctioned by section 522(f). Construing *Radford* as bottomed on the due process clause of the Fifth Amendment, several courts have concluded that *Radford* is still good law and that section 522(f), as applied to preenactment security interests, is unconstitutional. *See, e. g., Rodrock v. Security Indus. Bank*, 642 F.2d 1193 (10th Cir. 1981); *In re Hammer*, 9 B.R. 343 (Bkrtcy. N.D. Iowa 1981). Other courts have found that, as to the facts there presented, *Radford* has no precedential value. *See, e. g., In re Pommerer*, 10 B.R. 935 (Bkrtcy.D. Minn.1981). Indeed, at least one bankruptcy judge, following an exhaustive study of *Radford* and its progeny, has concluded that *Radford*, whether premised on either the due process clause or the taking clause of the fifth amendment, is no longer viable. *In re Pillow*, 8 B.R. 404 (Bkrtcy.D. Utah 1981) (finding that the five property rights listed in *Radford* were "dismembered" in subsequent decisions). Yet, in contrast, one commentator on the subject has argued that a "taking" analysis under *Radford* compels the constitutional invalidation of section 522(f) as applied to preenactment security interests. Comment, *Constitution-ality of Retroactive Lien Avoidance Under Bankruptcy Code Section 522(f)*, 94 Harv.L. Rev. 1616, 1632–35 (1981).

Still other courts have determined that, even assuming the continued vitality of *Radford*, a nonpurchase money security interest in household goods is entirely distinct, for purposes of fifth amendment analysis, from a mortgage on real property. *See, e.g., In re Pillow*, 8 B.R. at 418–20; *In re Goodrich*, 7 B.R. 590 (Bkrtcy.S.D. Ohio 1980); *In re Webber*, 7 B.R. 580, 584–86 (Bkrtcy.D.Or.1980); *In re Curry*, 5 B.R. 282 (Bkrtcy.N.D. Ohio 1980); *In re Rutherford*, 4 B.R. 510 (Bkrtcy.S.D. Ohio 1980). This distinction is viewed as material to the constitutional issue because of the *Radford* Court's delimiting statement that its concern was with "rights in specific property which are of *substantial value*." 295 U.S. at 601, 55 S.Ct. at 869 (emphasis added).

Following this pronouncement, these decisions have posited several qualitative and quantitative differences between the type of security interest affected by section 522(f) and liens on realty: (1) there is no direct relationship between the value of the household goods taken as collateral for the consumer loan and the amount of the loan as exists in a mortgage of real estate; (2) the value of the household goods is often nominal whereas realty has a measurable value comparable to the amount of the loan secured; and (3) the lender making small consumer loans, unlike a mortgagee, does not view a security interest in household goods as a potential substitute for the debt. In sum, these courts have concluded that, since the household goods given as security have little or no actual monetary value to the creditor, whatever property interest the creditor has in the collateral does not rise to the level of a mortgagee's property rights in realty.

Overall, it is clear from the foregoing discussion that *Radford* is the subject of much judicial dispute and discordant interpretation and application. For the purposes of deciding these consolidated bankruptcy appeals, however, it is unnecessary for the Court to enter the fray and engage in the

ongoing *Radford* debate. The issue in *Radford* was whether the property rights of a mortgagee already in existence could be abridged by subsequently enacted bankruptcy legislation specifically directed at preexisting mortgages. While the Court held such legislation unconstitutional, Justice Brandeis was careful to postulate that "[t]he power over property pledged as security *after the date of the Act* may be greater than over property pledged before." 295 U.S. at 589, 55 S.Ct. at 863 (emphasis added).

Here, the creditors acquired their nonpurchase money security interest in the debtors' household goods *after* the enactment of the Bankruptcy Reform Act. Thus, the creditors are chargeable with knowledge of section 522(f) and the lien avoidance provision is effectively impressed upon the post-enactment security agreements. As the Seventh Circuit has commented:

> All parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing bankruptcy laws and all future lawful bankruptcy legislation which might be enacted.

*In re Prima Co.,* 88 F.2d 785, 788 (7th Cir. 1973); *see In re Bradford,* 6 B.R. 741, 744 (D.Nev.1980) ("It is of the essence of bankruptcy legislation that creditors' rights and remedies will be substantially affected, modified and changed."); *In re Teske,* 9 B.R. 18, 20 (Bkrtcy.W.D.Mich.1981) ("When the transactions were consummated [after enactment], the [creditor] was chargeable with knowledge of the provisions of section 522(f) and its possible effect on proceedings commenced after October 1, 1979"); *In re Schulte,* 8 B.R. 12, 16 (Bkrtcy.D.Kan.1980) (preenactment case citing *North Laramine Land v. Hoffman,* 268 U.S. 276, 45 S.Ct. 491, 69 L.Ed. 953 (1925); *Diamond Glue Co. v. U.S. Glue Co.,* 187 U.S. 611, 23 S.Ct. 206, 47 L.Ed. 328 (1903); *McClure v. Oxford,* 94 U.S. 429, 24 L.Ed. 129 (1876) as supportive of lien avoidance from and after enactment, although the cases dealt with contract rights rather than property rights); *In re Webber,* 7 B.R. 580, 584 (Bkrtcy.D.Or.1980) ("It is not unreasonable to impute to credit companies and their attorneys the knowledge and understanding of new law *after* that law has been enacted."); *In re Seltzer,* 7 B.R. 80, 82 (Bkrtcy.D.Colo.1980) ("[T]his Court is not prepared to hold that it would be grossly unfair to charge [the creditor] with notice of § 522(f) from the time the new code was enacted."); *In re Head,* 4 B.R. 521, 524 (Bkrtcy.D.Tenn.1980) ("The law is that parties to contracts are chargeable with knowledge that their rights and remedies are affected by existing and future bankruptcy laws."); *In re Steinart,* 4 B.R. 354 (Bkrtcy.W.D.La.1980).

■ Certainly, the power of Congress to alter property rights pursuant to the bankruptcy clause is impliedly incorporated into all creditor-debtor agreements. *See Wright v. Union Central Ins. Co.,* 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490 (1938). Creditors are well aware that debtors' obligations may be discharged in bankruptcy and that certain debtors' property may be exempt from the property of the debtors' estates. Furthermore, since bankruptcy legislation, in some measure, has historically borne upon the interests of lien holders, *see In re Pillow,* 8 B.R. at 421–24, lienor creditors are fully aware that their interests may be affected in bankruptcy. Section 522(f), the most recent development in this history, simply preserves to the debtor that property which Congress had the unchallenged power to exempt from the debtor's estate in the first place. When, as occurred in these appeals, the security agreement is executed after the enactment of section 522(f), the capacity of the debtor to avoid the lien to the extent of his allowable exemptions in bankruptcy proceedings commenced on or after October 1, 1979, is impliedly written into the agreement by operation of law.

In reaching this conclusion, the Court cannot ignore the congressionally discerned abuses intrinsic in small consumer loan security agreements covering the borrower's household goods. The collateral, otherwise exempt in bankruptcy, has *de minimis* value

to the lender as measured against traditional notions of security for a debt. Foreclosure, as a means to satisfy the debt in the event of default and to recoup any losses, is never actually intended. Rather, the threat of foreclosure to the debtor who can ill-afford to replace his household possessions is the real, if not only, "security" for the debt. In some respects, then, the small consumer loan creditor, holding a security interest in a debtor's household goods, is akin to an unsecured creditor in the sense that neither has a genuine expectation of realizing the monetary value of the indebtedness from specific debtor's property as opposed to the general assets of the debtor's estate. As distinct from the unsecured creditor, the lien holder merely has the added leverage over the debtor of the threatened, but never actualized, seizure of the debtor's possessions essential to his everyday household existence. The avoidance of this leverage, and the attendant preservation of the debtor's exemptions, does not work an undue deprivation of a realizable monetary recovery by the creditor but instead, accords the debtor the legislatively intended fresh start following bankruptcy.

Accordingly, the orders of the bankruptcy court in these appeals are affirmed.