**In re Harry George WEBBER, Susan Marie Webber, Debtors.**

**Harry George WEBBER, Susan Marie Webber, Plaintiffs,**

v.

**CREDITHRIFT OF AMERICA, INC., NO. 6, Defendant.**

**Bankruptcy No. 380–00919.**

**Adversary Proceeding No. 80–0080.**

United States Bankruptcy Court, D. Oregon.

Nov. 17, 1980.

John H. Durkheimer, Portland, Or., for plaintiffs.

Stanley Fields, Salem, Or., for defendant.

Jonathan M. Hoffman, Asst. U. S. Atty., Portland, Or., for United States, plaintiff intervenor.

## OPINION

FOLGER JOHNSON, Bankruptcy Judge.

This proceeding has been brought by the debtors to avoid the lien of the defendant, Credithrift of America, on household furnishings, household goods and appliances of the debtors pursuant to § 522(f)(2) of the Bankruptcy Code. The bankruptcy petition was filed under Chapter 7 after October 1, 1979, and the case in which this adversary proceeding arises is therefore governed by such Code.

It has been stipulated that the defendant's lien is a nonpossessory, nonpurchase–money security interest that arose after November 6, 1978, and before October 1, 1979, that debtors–plaintiffs claimed exempt the property covered by the security agreement and that said property was held for the personal, family or household use of the debtors and would be exempt except for the defendant's lien.

11 U.S.C. § 522(f)(2) purportedly gives the Bankruptcy Court the right to avoid such lien and permit the debtors to retain such goods as exempt property without paying Credithrift. The sole question for the Court to decide is whether the avoiding of such lien violates the Fifth Amendment to the United States Constitution by taking property without due process of law if the security interest was created after November 6, 1978, the enactment date of the Bankruptcy Reform Act, and before October 1, 1979. While some portions of the Bankruptcy Reform Act of 1978 took effect upon enactment, the substantive part of the law comprising Title I of such Act and now commonly referred to as the Bankruptcy Code was only to take effect and apply to cases filed in the Bankruptcy Court on and after October 1, 1979.

Both parties filed briefs on the legal question and have waived oral argument. The United States Attorney was duly advised of the constitutional question and has intervened, filing a brief in support of the constitutionality of the law.

### Legislative Intent

To determine if Congress intended § 522(f)(2) to apply to security agreements created between the enactment date and effective date of the Bankruptcy Code, it is helpful to begin with the legislative history of the statute. When drafting § 522(f)(2), Congress was addressing a long–practiced evil of consumer financing—where a loan company would take a blanket security interest in all of a debtor's household goods in exchange for a small loan of money. The loan company would have no real intention of seizing the debtor's used furniture and other furnishings in the event of a default by the debtor, but if the debtor tried to discharge the debt in bankruptcy, the loan company would threaten a seizure of the debtor's goods in order to extract a reaffirmation promise. The debtor, unaware that the creditor was not seriously considering a levy on the goods and usually without the assistance of counsel, would give the reaffirmation promise and thereby place himself in the same unfortunate position he was in before the filing of bankruptcy.

The above–described evil was no less common and no less repugnant before October 1, 1979, than after that date, and there

is no indication in legislative history or in the Code itself that Congress felt security agreements entered into between the enactment date of November 6, 1978, and the effective date of October 1, 1979, should be immune from the effects of its remedial legislation. To the contrary, Congress clearly indicated that all debtors filing bankruptcy petitions after October 1, 1979, should receive equal rights and benefits. In its legislative history to § 402 of the Transition Title (Title IV) of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, Congress explained that the new Bankruptcy Code which went into effect on that date would apply to all *cases* filed on or after that date and to all substantive and procedural matters pertaining to those cases. (H.Rep.No. 95–595, p. 459, U.S.Code Cong. & Admin. News 1978, p. 5787.) See *In re Head*, 4 B.R.* 521, 524, 6 BCD 489 (Bkrtcy.D.Tenn. 1980). No exceptions were mentioned for debtors who may have had security agreements pre–dating the effective date.

What Congress was hoping to achieve generally with the passage of the federal exemption statute was a vehicle to provide consumer debtors with a meaningful rehabilitation from their financial failings. The statute was intended to relieve debtors from their oppressive debts while at the same time retain enough necessities of life for a "fresh start" which would keep them off public welfare.

Consequently, subsection (d)(3) of § 522 permits a debtor to exempt the first $200.00 of his interest in any item of household furnishings or goods. Any excess value will usually be exempt through the use of subsection (d)(5) which gives the debtor another $400.00 general exemption and the right to apply the "spill over" from the unused portion of the homestead exemption under subsection (d)(1). What subsection (f) does is give the debtor the complementary right of enforcing those exemptions in the face of nonpossessory, nonpurchase–money security interests. By being able to avoid the liens

from security interests, a debtor is assured that his exemption will not be nullified by such tactics as the enforcement, or threat of enforcement, of a blanket security interest in all his household goods. If a debtor would not be permitted to avoid the security interest simply because it was created by an agreement made before the effective date of the Code, his exemption right itself would become meaningless, and even though he were a debtor filing after October 1, 1979, he would wind up in the same predicament as was abhored by the Code's drafters. Such a consequence could not have been intended by Congress.

*No Unreasonable Impairment of Contracts*

■ Apart from Congress's intent in passing § 522(f)(2) is the question of whether Congress had the power to affect security agreements entered into before the effective date of the statute. One argument which has been advanced in cases cited by attorneys for the creditors is that a statute cannot constitutionally destroy the obligations of private contracts. However, this argument is invalid for two reasons as applied to the facts of the present case. First, it can be said that every exercise of Congress's bankruptcy power has the effect of impairing contracts to one degree or another. *Hanover National Bank v. Moyses*, 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902). Secondly, the constitutional restriction against impairing contracts found in Article I, section 10, clause 1, is made applicable only to the States, not to Congress. For a court to find that a Congressional act is an unconstitutional impairment of contract it must do so through an application of the due process clause of the Fifth Amendment, not through an application of the contract–impairment clause. This means that the court must not only find that the statute impairs contracts, but that it also is so grossly arbitrary and unreasonable as to be incompatible with fundamental law.

---

* Citations to B.R. refer to West's Bankruptcy Reports, which is a new bankruptcy reporting service of West Publishing Co.

In the case of *Continental Bank v. Rock Island Ry.*, 294 U.S. 648, 680, 55 S.Ct. 595, 608, 79 L.Ed. 1110 (1934), creditor-banks challenged a law permitting an injunction against the sale of collateral upon a debtor's default, even though the express terms of their contracts provided for such sale. In concluding that the legislation was a valid exercise of Congress's bankruptcy power, the Supreme Court held that the law was drafted with the direct aim and effect of relieving insolvent persons in whole or in part from the payment of their debts and that the effect on creditors was only collateral or incidental. The court stated at page 680, 55 S.Ct. at page 608:

"The Constitution, as it many times has been pointed out, does not in terms prohibit Congress from impairing the obligation of contracts as it does the states.... Speaking generally, it may be said that Congress, while without power to impair the obligation of contracts by laws acting directly and independently to that end, undeniably, has authority to pass legislation pertinent to any of the powers conferred by the Constitution, however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts.... And under the express power to pass uniform laws on the subject of bankruptcies, the legislation is valid though drawn with the direct aim and effect of relieving insolvent persons in whole or in part from the payment of their debts. See *Hanover National Bank v. Moyses, supra,* [186 U.S.] at p. 188 [22 S.Ct. at 860]. So much necessarily results from the nature of the power, and this must have been within the contemplation of the framers of the Constitution when the power was granted."

By analogy, the legislation which is the cause of controversy in the present case was enacted by Congress for the primary purpose of making a debtor's exemptions meaningful and effective, not for the purpose of destroying creditors' rights from security agreements. The effect which the statute has on creditors is purely collateral and incidental to the real thrust of the statute. As Judge Coutrakon of the U.S.

Bankruptcy Court for the Central District of Illinois stated in *In re Beck*: "I believe that Congress was acting reasonably in its desire to rehabilitate the debtor and did not enact legislation affecting rights of secured creditors to the extent that they were denied due process of law." 4 B.R. 661 at 664, 6 BCD 491 (1980).

To bolster the conclusion that Congress was acting only collaterally and incidentally with respect to creditors' rights is the recognition that Congress possessed the complementary power to its bankruptcy power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." Article I, section 8, clause 18 of the Constitution. Congress having acknowledged that it was a general goal of the Bankruptcy Reform Act to provide an effective modern bankruptcy mechanism for consumer debtors and to enable them to emerge from bankruptcy with adequate possessions, it is only a small logical step to realize that a debtor's avoidance of the types of liens subjecting all of his household goods and furnishings to a pre-bankruptcy security agreement was a necessary and proper measure for achieving the Congressional goal. See *U. S. Life Credit Corporation v. Steinart,* 4 B.R. 354, 2 CBC 2d 166; CCH Bankr.Law Reports, par. 67,457 (Bkrtcy.W.D.La.1980).

### Section 522(f)(2) Not Retroactive

The principal argument advanced by attorneys for the creditors in the present case is that an application of § 522(f)(2) to security agreements made prior to its effective date violates due process because of its retroactive operation. If we were dealing with security agreements made prior to the *enactment* date of the statute rather than its effective date, this court would agree with the creditors' position, and in fact, this court previously has rendered an opinion to that effect in *In re Hawley,* 4 B.R. 147, 6 BCD 365 (Judge Henry L. Hess, April 25, 1980). However, as to security agreements created during the "gap" period—between the November 6, 1978 enactment date and the October 1, 1979 effective date—this

court cannot accept the creditors' challenge based on retroactivity.

Congress clearly had the power to make laws affecting bankruptcies by virtue of Article I, section 8, clause 4 of the Constitution, and Congress exercised that power by enacting the Bankruptcy Reform Act on November 6, 1978, including § 522(f)(2). Any effect on security interests created after that time was a *pro*spective not a *retro*spective, effect. Application of 11 U.S.C. § 522(f) in this case does not violate the taking of property clause of the Fifth Amendment because the parties entered into the furniture loan agreement after Congress enacted the law. Defendant cannot successfully claim that Congress at the time of enactment lacked the power to affect later–created property. Consequently, a one–year delay in making the law effective logically could not diminish Congress's constitutional authority to subject such property to the avoidance powers of the new Code. Although it is not clear from the legislative history why Congress decided to have an eleven–month hiatus, it is more logical to assume that Congress wished to provide an adjustment period for the business community to familiarize itself and prepare itself for the sweeping changes which the new Code was to make in the law rather than to assume Congress felt it could not duly exercise its bankruptcy power for eleven months after the Code's enactment.

### Retroactive Effect Not Unfair

■ Even if this court were to accept the premise that § 522(f)(2) operates retroactively on security agreements created during the "gap" period, we would not be prepared to conclude that such retroactivity in itself makes the statute unconstitutional. As when making out a case for an impairment of contractual obligations by Congress, it is necessary to show that the retroactive effects of a statute are so unreasonable and arbitrary as to deny due process under the Fifth Amendment. *Usery v. Turner,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Matter of U. S. Financial, Inc.,* 594 F.2d 1275, 1281 (9th Cir. 1979); *In re*

*Head,* 4 B.R. 521, 523, 6 BCD 489 (Bkrtcy.D. Tenn.1980); and *In re Beck,* 4 B.R. 661, 6 BCD 491 (Bkrtcy.C.D.Ill.1980). In *Beck,* a case almost identical in fact and law to the case at hand, the bankruptcy judge stated at page 664 of 4 B.R.: "[T]he fact that the Code applies retroactively presents no concern unless the retroactivity is unreasonable." Just as the judge in that case found § 522(f)(2) of the Bankruptcy Code not unreasonable as applied to "gap"–created security agreements, neither does this court find that the retroactive effect of the statute, if there is any, is unreasonable, arbitrary, capricious, or unfair.

It is not unreasonable to impute to credit companies and their attorneys the knowledge and understanding of a new law *after* that law has been enacted. Such persons hardly can claim "unfair surprise" by an enacted statute of Congress having such a serious impact on their industry. That they continued after November 6, 1978, to make and approve nonpurchase–money loan agreements containing "blanket security" interests in household goods shows either an inexcusable ignorance of the law or a willingness on their part to accept the risks inherent in the law. As stated by Bankruptcy Judge Clive W. Bare for the District of Tennessee in *In re Head,* 4 B.R. 521, 524 (Bkrtcy.1980), in cases nearly identical to ours:

"The delay of over eleven months between the enactment of the Bankruptcy Code and its effective date gave creditors adequate time to familiarize themselves with the provisions of the Code and the effects it would have on their relationships with debtors. In the instant cases, both loans were negotiated *after* the enactment of the statute. Home Credit cannot say that the effect of the Code on its purported lien rights was a total surprise."

In a situation involving federal tax laws, the Court of Appeals for the Eighth Circuit recently held that a retroactive application of a tax increase was not unconstitutional even though the law approving the increase was enacted in 1976 and was made to apply to transactions in 1975. The court said that

taxpayers should have anticipated the imposition of an increase in the minimum tax because such a tax was in existence at the time they allegedly contracted to sell the real estate. Thus, the retroactive increase was not so harsh or discriminatory as to violate the Constitution. *Buttke v. Commissioner of Internal Revenue*, 625 F.2d 202, 203 (8 Cir. 1980).

It should be noted that § 522(f)(2) is not so sweeping as to deprive loan companies and other such creditors of all their rights in security agreements made after November 6, 1978. First, the statute does not apply to purchase–money security agreements, but rather to nonpurchase–money agreements where debtors already own the goods made subject to security interests. Secondly, the statute does not necessarily permit a debtor to avoid an entire security interest, but rather just a debtor's own exemptable equity in the secured household goods, tools of trade or health aids. Such exemptable interest for household goods is limited to $200.00 per item, unless the debtor claims any excess over $200.00 under (d)(5) of § 522. A debtor who exhausts his entire $7,500.00 of his (d)(1) exemption plus his additional $400.00 of his (d)(5) exemption all on a homestead claim cannot avoid a security interest from a nonpurchase–money security agreement to an extent of over $200.00 in any one household item. Thus, if the particular secured item is worth more than that amount, the debtor would have to choose among three courses of action: giving up possession of the item to the secured creditor, paying the creditor the amount of the creditor's alleged claim minus $200.00, or paying the creditor the fair market value of the item minus $200.00 if the value is less than the creditor's claim. See *U. S. Life Credit Corporation v. Steinart*, 4 B.R. 354, 2 CBC 2d 166; CCH Bankr.Law Reports par. 67,457 (Bkrtcy.W. D.La.1980), and *Matter of Meyers*, 2 B.R. 603, 5 BCD 1306 (Bkrtcy.E.D.Mich.1980).

Thirdly, the statute does not apply to security interests in collateral consisting of anything other than household items listed in § 522(d)(3), tools of trade in § 522(d)(6), and professionally prescribed health aids listed in § 522(d)(9). For other types of collateral where the value at the time of the loan may have been equal to or greater than the security interest (notably in the case of vehicles) creditors are able to continue full enforcement of their nonpurchase–money security agreement rights regardless of when those agreements were created. *In re Meyers, supra.* As explained by Bankruptcy Judge Rodney Bernard, Jr. in *U. S. Life Credit Corporation v. Steinart, supra*, 4 B.R. 354, 2 CBC at page 171:

" . . . Sec. 522(f) was adopted specifically in recognition of the fact that some creditors lending money to a consumer debtor will take a security interest in all of the debtor's household goods, and then have the debtor waive his exemption rights. The creditor then may use threats of repossession as a means of leverage in obtaining payment. Although the household goods themselves may be of little resale value, the replacement cost is high, so the debtor is coerced into making payments he simply cannot afford to make. . . .

"Since the purpose of Sec. 522(f) is to remedy the effect of an overreaching creditor on an uninformed debtor, it would seem that in all fairness the results should differ where the property in question is truly valuable and was given as security due to its value. . . . [The statute's] application should not be extended beyond the evil it attempts to reach."

Finally, even in those situations where all the conditions for lien avoidance under § 522(f)(2) are met by the debtor, the creditors are not left totally without recourse. They still have the right to file proofs of claim as unsecured creditors and share in any possible distribution of assets in the estate. It is true that this right may not be worth much since in most cases there is an unlikelihood of any assets remaining for distribution. However, the chances of assets may in fact be no lower than the chances of a creditor's actually conducting a seizure of a debtor's used household furniture and furnishings under a "blanket security interest" in the goods permitted un-

der the old law. In other words, the creditor's expectations of converting its blanket security interest into any meaningful monetary recovery is not much different than his expectations of recovery of a share of assets from the debtor's estate. What really has been of value to the creditors under their blanket security interests has been the ability to extract reaffirmation promises from debtors through *threats* of foreclosures rather than actual foreclosures. It is this threat which is removed by § 522(f)(2), and this court does not feel it unfair to remove such threat with respect to "gap" security agreements made any time after the enactment of the statute.

In reviewing the numerous opinions on § 522(f)(2) from other courts, we find that to date six have fact patterns from which it can be ascertained that security agreements were made during the "gap" period, and in five of those opinions, courts have reached the same result as we reach today. See *In re Head*, 4 B.R. 521, 6 BCD 489 (Bkrtcy.D. Tenn.1980); *In re Beck*, 4 B.R. 661, 6 BCD 491 (Bkrtcy.C.D.Ill.1980); *U. S. Life Credit Corporation v. Steinart*, 4 B.R. 354, 2 CBC 2d 166, CCH Bankr.Law Reports, par. 67457 (Bkrtcy.W.D.La.1980); *Matter of Cox*, 4 B.R. 240, 2 CBC 2d 255 (Bkrtcy.S.D.Ohio 1980), and *In re Beard*, 5 B.R. 429, 2 CBC 2d 895 (Bkrtcy.S.D.Iowa 1980). *In re Panesky*, 5 B.R. 201, 2 CBC 2d 835 (Bkrtcy.N.D.Ohio 1980), refused to avoid the security agreement, but on a different basis not affecting our reasoning in the present case. Only in the first three cases did the court consider the question of constitutionality or retroactivity. *Beard* rested on a definition of household goods or appliances and *Cox* and *Panesky* dealt with Ohio law, which state had voted to prevent use of the federal exemptions by Ohio residents.

Even in the cases involving security agreements made *prior* to the enactment date of the statute, some courts have allowed debtors to avoid security interests: *Matter of Rutherford*, 4 B.R. 510, CCH Bankr.Law Reports, par. 67,534 (Bkrtcy.S. D.Ohio 1980); *In re Ambrose*, 4 B.R. 395, 6 BCD 454 (Bkrtcy.N.D.Ohio 1980); *In re Curry*, 5 B.R. 282, 2 CBC 2d 710 (Bkrtcy.N.

D.Ohio 1980); *In re Baker*, 5 B.R. 397, 6 BCD 747 (Bkrtcy.W.D.Miss.1980). The reasoning in *Rutherford, Ambrose* and *Curry* in particular applies equally well to support the avoidance of liens created during the "gap" period. Five others have reached a contrary result: *In re Hawley*, 4 B.R. 147, 6 BCD 365 (Bkrtcy.D.Or.1980); *In re Rodrock*, 3 B.R. 629, 1 CBC 2d 1022 (D.Col. 1980); *In re Hoops*, 3 B.R. 635, 1 CBC 2d 983 (Bkrtcy.D.Colo.1980); *In re Jackson*, 4 B.R. 293, 6 BCD 612 (Bkrtcy.D.Colo.1980); and *In re Pierce*, 4 B.R. 671 (Bkrtcy.W.D. Okl.1980).

There are other cases dealing with § 522(f)(2) where it is not shown when the security interest on household goods was first perfected, but none of them has held the law invalid.

■ Recognizing that there should be a distinction between cases where the lien arose before November 6, 1978, and those where it arose between the enactment and effective dates of the Bankruptcy Code, the court concludes that § 522(f)(2) is constitutional in so far as it applies to liens arising between November 6, 1978, and October 1, 1979, and the plaintiffs are entitled to the voiding of the defendant's lien on their household furnishings, household goods and appliances.