CUMMINGS, Chief Judge,
dissenting.
I disagree with the opinion of the majority. In my judgment Congress intended Section 522(f)(2) to be applied “retroactively” and such application will not violate the Fifth Amendment prohibition against taking private property for public use without just compensation. Because the Congressional intent concerning the application of Section 522(f)(2) is so clear, the majority has done a disservice by failing to resolve directly the harder issue of whether that provision involves an uncompensated taking. Instead, the majority’s opinion deter *475 mines only the diluted issue of “whether retroactive application of § 522(f)(2) would give rise to * * * serious constitutional questions under the Fifth Amendment” or “present a significant risk of overstepping those constitutional limitations” (at p. 470). Although it is of course prudent policy to construe ambiguous statutes constitutionally, there are limits to fair construction, and when as here the proposed construction would substantially postpone the statute’s intended operation, the constitutional motive should be fully articulated.[1]
I. Congress Intended Section 522(f)(2) to Apply to This Type of Pre-enactment Lien.
The first question is whether Section 522(f)(2)[2] lets debtors avoid the Wisconsin security interests it describes although they attached prior to its enactment. Like the other substantive provisions of the 1978 Bankruptcy Act, Section 522(f)(2) does not state when it, as opposed to the rest of the Act, is to apply. Congress did not adopt the habit of scattering throughout the statute its directions for time of application. Rather, all temporal clues were compendiously posited in Title IV of the Act. Thus Section 401 of Title IV provides that all former laws relating to bankruptcy are repealed. Section 402(a) states that “[e]xcept as otherwise provided in [Title IV], this Act shall take effect on October 1, 1979.” The combined effect of Sections 401 and 402(a) is to provide as substantive law only the new Act for eases commenced on or after October 1, 1979. See generally 1 Collier on Bankruptcy 17.02 (15th ed. 1980). Since Title IV provides no exceptions for Section 522(f)(2), *476 that Section must apply to cases filed after the effective date.
Nevertheless, several arguments have been advanced for not applying Section 522(f)(2) in cases filed after the effective date with regard to security interests created prior to enactment of the statute. The first argument, essentially adopted by the majority opinion, is that such application could amount to an unconstitutional taking. That argument will be dispelled as a corollary to the discussion in the next part of this opinion concerning the taking question. A related argument, that by “repeated reference to the Radford decision” Congress recognized “the limits of the bankruptcy power to deprive creditors of property rights” (at p. 473) is without merit as to Section 522(f)(2). Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, a 1935 case which the majority cites as precedent for its decision, is indeed mentioned in the House and Senate Reports accompanying the new bankruptcy statute, but each time in contexts entirely unrelated to limitations on Section 522(f)(2).[3] Even if the citation to Radford implied recognition of Fifth Amendment limits, it does not follow that Congress intended to abridge Section 522(f)(2). On the contrary, by failing to make express exceptions from the language of that Section, Congress must have believed it could withstand the “recognized” possibility of constitutional challenges. In any event, divining legislative intent is often dubious business as the majority acknowledges when it states that “the legislative history is silent as to whether such avoidance is intended to apply to pre-enactment liens * * * ” (at p. 472). Therefore, we are left only with the words of the statute, which compel the application of Section 522(f)(2) to cases arising on or after October 1, 1979, without regard to the age of avoided security interests.
Another possible argument for ignoring Section 522(f)(2) with respect to pre-enactment security interests such as defendant’s, raised as a question during oral argument, is that its language “to avoid the fixing of a lien” was intended to apply only to those liens not yet “fixed” when the bankruptcy petition is filed, i.e., there was to be no avoidance of any pre-existing liens. The argument clearly proves too much, for it is apparent from the purpose of the Section and from its legislative history that Section 522(f)(2) was meant to apply to certain security interests already existing and attached at the time of bankruptcy. S.Rep.No. 95-989, 95th Cong., 2d Sess. 76, reprinted in [1978] 5 U.S.Code Cong. & Ad. News 5862; H.R.Rep.No. 95-595, 95th *477 Cong., 2d Sess. 362, reprinted in [1978] 5 U.S. Code Cong. & Ad. News 6318; Report of the Commission on Bankruptcy Laws of the United States, H.R.Doe.No. 93-197, 93d Cong., 1st Sess., Part I at 169, 173 (1973). If Section 522(f)(2) were not meant to apply to pre-existing interests, the remainder of its effect would be to avoid liens attaching to property of the bankrupt’s estate. But
Section 522(f) would not serve its intended purpose if it applied only to security interests that attached to property of the estate * * *. Congress was meticulous in its use of property of the debtor or property of the estate. See, e.g., 11 U.S.C. § 362(a)(4) & (5) (1979). * * * [Section] 522(f) uses “an interest of the debtor in property.” Furthermore, § 522(f) makes avoidable a lien that “impairs,” not would impair, an exemption and that “is,” not would be, a security interest.
In re Giles, 9 B.R. 135, 137 (Bkrtcy.E.D. Tenn.1981). Hence despite its curious phrasing Section 522(f)(2) must contemplate avoidance of security interests attached pri- or to filing.[4]
The majority opinion suggests one final argument for construing Section 522(f)(2) as inapplicable to pre-enactment security interests, viz., that absent “specific language,” we are to presume that a statute does not apply “retroactively” to destroy a “strong interest” (at p. 473). A few remarks should dispel such a presumption.
First, the language of Section 522(f)(2) is “specific” in that it applies to the sort of security interest sought to be avoided here. If Congress meant to include pre- and post-enactment security interests, it would write simply “security interest,” which imports both. It is at best semantically inefficient for the majority to require Congress to mention specially each class of strong interests injured by its action. At worst, such a requirement of statute-drafting breeds not better statutes but increased litigation as creditors notice that their peculiar interests too are not specially addressed by “specific language” in the allegedly injuring statute.
Second, Section 522(f)(2) is not a truly “retroactive” provision in the sense that it applies to transactions finished prior to enactment and allows the parties no notice of the impending law nor opportunity to adjust their conduct. It is hard to find a valid distinction between a creditor who took the avoidable security interest twenty months before a June 1980 bankruptcy (like Thorp Finance Company), and a creditor who took eighteen months (just after enactment) or six months (just after the effective date) before the same bankruptcy. In each case, the security interest is not affected until the debtor files for bankruptcy. Since the debtor cannot file for bankruptcy under the new Act until at least eleven months after the date of enactment, the creditor in each ease has had some opportunity to adjust to the new law: to watch the debtor more closely, and in the case of a default to enforce the security interest or threaten to do so. Surely the defendant commercial creditor here was able to anticipate the emergence of a new bankruptcy law, which took some ten years to enact and which finally was enacted only one month after creation of the security interest.[5] As we *478 have held, “[a]ll parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing bankruptcy laws and all future bankruptcy legislation which might be enacted.” In re Pri-ma Co., 88 F.2d 785, 788 (7th Cir. 1937).[6]
Finally, any presumption against destroying “strong interests” will cause mischief when applied to a bankruptcy statute, which by nature undoes many creditors’ expectations of repayment. Bankruptcy legislation has historically operated to affect creditor interests that have accrued prior to enactment. See, e.g., Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S. Ct. 1025, 1033, 82 L.Ed. 1490; In re Pillow, 8 B.R. 404, 407-410 (Bkrtcy.D.Utah 1981); In re Hoops, 3 B.R. 635, 637 (Bkrtcy. D.Colo.1980), affirmed, sub nom. Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), probable jurisdiction noted, - U.S. -, 102 S.Ct. 969, 71 L.Ed.2d 108; 3 Collier on Bankruptcy ¶ 522.01 at 522-8 (15th ed. 1981). The creditor interests here deserve no special presumption against injury.
There being no valid argument to the contrary, Section 522(f)(2) must apply along with the rest of the Bankruptcy Act to security interests like this created prior to enactment. The only other appellate court to consider this issue agreed with this conclusion. Rodrock, supra, 642 F.2d at 1196—1197.[7]
II. This Statutory Provision Is Constitutional.
The remaining issue is whether application of Section 522(f)(2) to avoid this pre-enactment security interest in plaintiff’s *479 household goods is an uncompensated taking proscribed by the Fifth Amendment.[8]
There is no “ ‘set formula’ for determining when ‘justice and fairness’ require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.” Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631. Rather, a taking analysis is bound up with the particular facts of each case. Nevertheless,
[i]n engaging in these essentially ad hoc, factual inquiries, the [Supreme] Court’s decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See Goldblatt v. Hempstead, [369 U.S. 590,] 594 [82 S.Ct. 987, 990, 8 L.Ed.2d 130]. So, too, is the character of the governmental action. A “taking” may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Causby, 328 U.S. 256 [66 S.Ct. 1062, 90 L.Ed. 1206] (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659. More recently, in Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, the Supreme Court reiterated the three hallmarks of a taking determination: “the economic impact of the regulation, its interference with reasonable investment backed expectations and the character of the governmental action * *.” Application of those factors to the defendant’s security interest in plaintiffs’ household goods shows that the lien avoidance permitted by Section 522(f)(2)(A) does not contravene the taking clause.
A. The “Property” Interest
First, the “investment backed expectations” interfered with are less than substantial. The nonpossessory, nonpurchase-mon-ey security interests allegedly taken are far from “property” of the same importance as the mortgages on farms taken in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, or the materialmen’s liens on ships taken in Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. Thus these cases do not support the majority’s suggestion that Section 522(f)(2) involves a taking. The types of liens in Radford and Armstrong attach to (or are severed from, depending on the metaphysics) property of the debtor that has directly benefited from the loan or work done. A farm, for example, is mortgaged to buy land, seed, fertilizer or tools. A materialman’s lien attaches to a ship because the materialman has supplied the ship with material or labor. In either case, if the underlying debt is unpaid the creditor has a direct property interest in the objects that were purchased or created with the loaned capital or effort.
In contrast to such purchase-money interests, defendant’s expectations reside in the threat of foreclosure rather than in the collateral. The creditor’s interest is often abused and consequently is much less deserving of protection. Unlike the advances in Radford and Armstrong, the borrowed money here was not lent to purchase or improve the household goods listed in this security agreement and specifically avoidable under Section 522(f)(2)(A). The Thirteenth Amendment prohibition against slavery and involuntary servitude prevents the creditor from taking a property interest in the direct beneficiary of his loan, the consumer. Therefore, as here, the creditor must settle for a security interest unrelated to the debt, such as in home furnishings needed by the consumer for ordinary living, and the creditor’s “reasonable investment *480 backed expectations” are reduced accordingly. As several bankruptcy courts have recognized:
(1) there is no direct relationship between the value of the household goods taken as collateral for the consumer loan and the amount of the loan as exists [, for example,] in a mortgage of real estate; (2) the value of the household goods is often nominal whereas realty has a measurable value comparable to the amount of the loan secured; and (3) the lender making small consumer loans, unlike a mortgagee, does not view a security interest in household goods as a potential substitute for the debt. * * * [T]hese courts have concluded that, since the household goods given as security have little or no actual monetary value to the creditor, whatever property interest the creditor has in the collateral does not rise to the level of a mortgagee’s property rights in realty.
Matter of Ward, 14 B.R. 549, 561 (S.D.Ga. 1981) (summarizing In re Pillow, 8 B.R. 404, 418-420 (Bkrtcy.D.Utah 1981); In re Goodrich, 7 B.R. 590 (Bkrtcy.S.D.Ohio 1980); In re Webber, 7 B.R. 580, 584-586 (Bkrtcy.D. Or.1980); In re Curry, 5 B.R. 282 (Bkrtcy.N. D.Ohio 1980); In re Rutherford, 4 B.R. 510 (Bkrtcy.S.D.Ohio 1980)).[9]
Because used household goods have so little resale value, the only “reasonable investment backed expectation” rests in the ability to threaten taking possession of them as a means of inducing payment.[10] But this ability to threaten is entitled to little deference in bankruptcy proceedings, however potent it may be in other circumstances. “Historically, lien rights have entitled their holders to the value of collateral and no more in bankruptcy.” In re Pillow, supra, 8 B.R. 404, 411. The majority insists that “[a] property right is of value regardless of the worth of the object in which it is held, and is protected from governmental appropriation by the taking clause of the Fifth Amendment” (at p. 473). But we should look through the form of the interest to its substance and characterize it accordingly.
B. Government Interference With the Creditor’s Property Interest
Even if the label “property interest” is not illusory, however, the difference that *481 being able to avoid such liens under Section 522(f)(2) makes it minimal. Before the enactment of the Bankruptcy Reform Act, initiation of a Chapter 7 proceeding would have presented secured lenders like Thorp with the following options:
(a) filing their claims as secured to the extent of the value of the collateral and as unsecured for the amount of the deficiency, subject to proof and allowance by the bankruptcy court;
(b) waiving the security and filing the entire claim as unsecured; or
(c) remaining aloof from the proceedings and attempting later to obtain satisfaction.
See generally F. Kennedy, Priorities and Liens, in Institute of Continuing Legal Education Bankruptcy and The Chapter Proceedings, 163, 177-182 (1976).
The economic impact of Section 522(f)(2) is to allow the debtor to force a carefully delimited class of lenders to choose option (b). The creditor, in general, would prefer option (c), because it would allow him to coerce repayment of an amount greater than the “garage-sale” value of the collateral. This Court need not decide whether this ability to coerce is part of the creditor’s “property interest” or merely an incident of his pre-bankruptcy contract right to repayment (which the Federal government as opposed to the states may impair) since the interference is so slight. Whatever “investment backed expectations” the creditor had, they are surely at a minimum following the debtor’s bankruptcy.
Moreover, Congress has not entirely destroyed the expectation of repayment but instead has substituted for it the rights of an unsecured creditor, viz., the substance of option (b). There is some authority, although the decisions are split, that a similar substitution took place under the old Act.[11] Lenders whose collateral was exempt property under the various state-law provisions were sometimes deemed to be wholly unsecured because the collateral was not “of a nature to be assignable under this Act.” Repealed 11 U.S.C. § 1(28) (definition of “secured creditor”).[12] Against this background, the extent of the surprise to lenders like Thorp can be assessed. First the ambiguities of state exempt-property law have been removed. Small-ticket items of necessity to day-to-day life are exempt, by virtue of Section 522(f)(2)’s lien avoidance provision, whether the debtor chooses state exemptions or uniform federal exemptions under Section 522(b). Second, the possibility that existed under the old Act — that lenders with a security interest in exempt property would be required to treat their entire debt as unsecured — has been made a certainty, but only insofar as the security interest is in household items worth less than $200 apiece. As the Government in-tervenor notes, the creditor may still proceed against the debtor’s collateral to the extent that any item exceeds $200 in value (Br. 36). 11 U.S.C. § 522(d)(3). Taken together, these elements indicate that Section 522(f) is a de minimis interference that does not rise to the level of a taking under the Fifth Amendment.[13]
C. The Character of the Government Action
Finally, as to the character of the government action, Section 522(f) is an adjustment *482 of benefits and burdens among the debtor and his creditors, and among a narrow class of secured creditors and the debtor’s general creditors. It seems unlikely that defendant, the holder of a nonpossessory, nonpur-chase-money security interest in household goods, has a significantly greater expectation of repayment than other unsecured creditors of the consumer, such as unsecured retailers, landlords, and credit-card companies. It is even more unlikely that the difference in expectations should be allowed a veto over Congress’ power to make bankruptcy law. A fair reordering such as this of the competing claims of creditors to available funds of a bankrupt should be immune to a taking challenge. See Sax, Takings, Private Property and Public Rights, 81 Yale L.J. 149, 161 (1971).
The government action here is not of the nature of a physical invasion since Section 522(f)(2) does not apply to lenders who have possession of the collateral pursuant to pos-sessory security interests. Nor does the action inure to the government’s own benefit. Thus this case is again distinguishable from Armstrong, supra, where the government “took” materialmen’s liens that encumbered government-owned ships.
As ably discussed in the majority opinion, Congress intended to discourage the abusive practices of creditors like Thorp by allowing debtors in bankruptcy to avoid the security interests instrumental to the abuse. In deciding whether such an action is a taking, we must remember that an affirmative answer would either force significant abandonment of the Congressional purpose or entail Congressional compensation for disappointed lenders.
Suffice it to say that government regulation — by definition — involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. “Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.” Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 [43 S.Ct. 158, 159, 67 L.Ed. 322] (1922).
Andrus v. Allard, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210. Congress must have the freedom to adjust benefits and burdens when it acts pursuant to its bankruptcy powers, because' — again, by definition — there are always too few funds of the bankrupt to make all of the creditors whole. Unless Congress is to be made the guarantor of defaulting debtors, its bankruptcy statute must be allowed to devalue the rights of at least creditors like this one. There is no irrationality in Congress’ choice to “smart” this particular class of creditors, and therefore there is no need for compensation when avoiding liens on these necessities of family life.
I would affirm the order of the bankruptcy court avoiding defendant’s security interest.

. There are perhaps three reasons of arguable merit for twisting a statute to evade constitutional issues, but each is inapplicable here. First, the construction might be deemed necessary to counter the unjust effects of some rule of constitutional jurisprudence that for independent reasons must be maintained. For example, Greenblatt, Judicial Limitations on Retroactive Civil Legislation, 51 Nw.U.L.Rev. 540 (1956), cited by the majority, would allow the Court to adopt a statutory reconstruction that is “not totally implausible” when a bad statute otherwise would be upheld under the due process clause “because of the ordinary presumption in favor of constitutionality.” Id. at 553 (citations omitted). There is no similar danger in this case; Congress is held fully accountable for any unconstitutional takings. Second, because of the tendency of new decisions to damage the precedential foundation, some issues of constitutional law are best adjudicated infrequently. The First Amendment Religion Clauses provide a good example, as the majority notes by citing National Labor Relations Board v. Catholic Bishop, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533. Taking cases, on the other hand, are usually confined to their particular facts. See p. 478, infra. Finally, there may be instances when interbranch diplomacy suggests that a statute be construed to avoid an explicit finding of uriconstitutionality. See, e.g., Hart & Wechsler’s The Federal Courts and the Federal System 336 (2d ed. 1973) (“the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat [constitutional rights]”). Diplomacy here can only suggest that Congress be given some reason for this Court’s refusal to apply its law, so that it may know how to improve the law to the Court’s liking.
When a statute is ambiguous from its face, purpose, and history, a court may be justified in choosing one rather than another of its possible constructions. But when the statute evinces no ambiguity, a federal court is without power independent of the Constitution for rewriting it. “A statute is not ‘a nose of wax to be changed from that which the plain language imports. . . .’ Yu Cong Eng v. Trinidad, 271 U.S. [500], at 518 [46 S.Ct. 619, 623, 70 L.Ed. 1059].” Catholic Bishop, supra, 440 U.S. at 518, 99 S.Ct. at 1328 (Brennan, J., dissenting).

. Section 522(f)(2) provides (11 U.S.C. § 522(f)(2));
Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
5{S * :}{ ifc ifc !(S
(2) a nonpossessory, nonpurchase-money security interest in any—
(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
(C) professionally prescribed health aids for the debtor or a dependent of the debtor.

. Radford is cited in connection with Section 522(c) (which provides that with certain exceptions property exempted under Section 522 is not liable for any prior debt of the debtor) by Senate Report No. 95-989, 95th Cong., 2d Sess. 76 and House Report No. 95-595, 95th Cong., 2d Sess. 361, reprinted in [1978] 5 U.S.Code Cong. & Ad.News 5862, 6316 for the proposition (stated identically in both reports) that “[t]he rule of Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property.” Long v. Bullard held that when “the creditor neither proved his debt in bankruptcy nor released his lien * * * his security was preserved notwithstanding the bankruptcy of his debtor.” 117 U.S. at 620-621, 6 S.Ct. at 918. Both reports refer only to 295 U.S. page 583, 55 S.Ct. page 860 of the Radford opinion, where Long v. Bullard is cited as historical support for the same proposition: “But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a mortgage even of exempt property was not disturbed by bankruptcy proceedings.” 295 U.S. at 582-583, 55 S.Ct. at 860. Clearly, Congress cited these cases to explain its adoption of a technical bankruptcy rule in Section 522(c) as to exemptions but not to limit the effect of Section 522(f)(2).
Radford is also cited in connection with Section 361 (which deals with adequate protection of an interest of an entity in property) by Senate Report No. 95-989, 95th Cong., 2d Sess. 49 and House Report No. 95-595, 95th Cong., 2d Sess. 339, reprinted in [1978] 5 U.S.Code Cong. & Ad.News 5835, 6295 as one of the sources of the notion of “adequate protection” for secured creditors such as the mortgagee in Radford. Section 361 is not at issue on this appeal nor applicable to the present exemption. In any case, under Section 361 and according to the House Report, such adequate protection would not exceed the value of the collateral, which in this case is worth much less to the creditor than the threat of foreclosure on the security interest (see pp. 479-480 infra).

. Probably Congress used the phrase “avoid the fixing of a lien” to relate avoidance of the security interest back to the time it attached. By definition, the “fixing” or granting of a security interest is a “transfer.” 11 U.S.C. § 101(40) (1979); 11 U.S.C. § 1(30) (prior Act, 1976) (“‘Transfer’ shall include * * * fixing of a lien upon property * * *.”); In re Pine, 11 B.R. 595, 601-604 (Bkrtcy.E.D.Tenn.1981); In re Giles, supra, at 137. The debtor’s avoidance of the “fixing of a lien” is thus analogous to the trustee’s avoidance of a late perfected security interest under the preferential transfer section, 11 U.S.C. § 547. “Under that section, technically the trustee avoids the grant of the security interest, the transfer made within the preference period. * * * The terminology used in § 522(f) is surprising as a practical matter but consistent in concept with other provisions of the Code.” In re Giles, supra, at 137 (citation omitted).

. Quite likely there are creditors who were informed of the coming changes and perfected as many of these security interests as possible prior to enactment. In Wisconsin, where this loan transaction took place, the financing statement that perfects the security interest is good for at least five years, Wis.Stat.Ann. § 409.- *478 403(2) & (3), and the same security interest may be used to secure a series of different loans to the consumer. Wis.Stat.Ann. § 409.-204(3). Thus under the majority holding, with a single security interest perfected just prior to enactment and a few pieces of furniture, the creditor can lend to a single customer and ignore Section 522(f)(2) for a period of four or more years after the effective date of the Bankruptcy Act. Congress did not intend to postpone Section 522(f)(2) indefinitely, but such a “gap” in time between Congressional action and an effective remedy would seem to be the effect of the majority decision.
Since the record on appeal excludes the “fine print” terms on the reverse side of the security agreement used here, it is uncertain whether the security interest extended to post-enactment advances. In cautious dictum, however, the majority suggests to Thorp that avoidance of the security interest with respect to post-enactment advances would not be deemed a taking. Although such a compromise has a ring of fairness, the distinction it draws between pre- and post-enactment advances may be spurious. The “property” interest in either case would have been created prior to enactment of Section 522(f)(2), and until this decision, creditors had the same expectations under Wisconsin law of using the security interest to coerce repayment of their post- and pre-enactment advances.

. See also Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490, quoting Home Bldg. & Loan Ass’n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413: “The mortgage contract was made subject to the constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between plaintiffs and defendant. ‘Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.’ ” Accord, Matter of Ward, 14 B.R. 549, 562 (S.D.Ga.1981); In re Bradford, 6 B.R. 741, 744 (D.Nev.1980); Matter of Teske, 9 B.R. 18, 20 (Bkrtcy.W.D.Mich.1981); In re Schulte, 8 B.R. 12, 16 (Bkrtcy.D.Kan. 1980); In re Webber, 7 B.R. 580, 584 (Bkrtcy.C.Or. 1980); In re Seltzer, 7 B.R. 80, 82 (Bkrtcy.D. Colo.1980); In re Head, 4 B.R. 521, 524 (Bkrtcy.D.Tenn.1980); In re Steinart, 4 B.R. 354, 358 (Bkrtcy.W.D.La.1980). Cf. Wis.Stat.Ann. § 409.104(1) (“This chapter [regarding secured transactions] does not apply: (1) To a security interest subject to any statute of the United States * * *.”).

. As explained in Rodrock:
If the Reform Act were applied only to those cases commenced after October 1, 1979, which involved security interests which came into existence after that date, there would be no bankruptcy law applicable to cases filed after October 1, 1979. We cannot believe that Congress intended such a no-man’s land.

. “[N]or shall private property be taken for public use, without just compensation." U.S. Const.Amend. V.

. Wisconsin law establishing and regulating security interests also recognizes these distinctions between purchase- and nonpurchasemoney types of liens. The Wisconsin Consumer Act, for example, which provides special protection for “consumer credit transactions,” Wis.Stat.Ann. §§ 421.301(10), 422.102, does not apply to first mortgages on real estate, Wis.Stat.Ann. § 421.202(7); see also Miller, The Effect of WCA on Farm Credit, 46 Wis. Bar Bull. 20 (April 1973), or to “liens which arise by operation of law or by force of a mechanics’ lien or similar statute * * Holbrook & Bugge, Creditor’s Responsibilities and Duties Under the WCA, 46 Wis. Bar Bull. 37, 43 (Feb. 1973). Thus, while the Wisconsin Consumer Act applies to the security interest here, it would be inapplicable to the sort of property interests taken in Radford and Armstrong. Similarly, purchase-money security interests are accorded various priorities over “lien creditors” and nonpurchase-money security interests, Wis.Stat.Ann. §§ 409.301(2), 409.312(3) & (4), and may be created more easily in some instances. Wis.Stat.Ann. § 409.302(1)(d). These differences are not dispositive, but further evidence that nonpurchase-money security interests in consumer effects are not property interests whose taking must be compensated. Cf. Dames & Moore v. Regan, 453 U.S. 654, 674, 101 S.ct. 2972, 2984 n.6, 69 L.Ed.2d 918 (President Carter’s nullification of attachment of Iranian assets was not a taking because there was no “property” interest in the attachment).

. See Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc.No. 93-197, 93d Cong., 1st Sess., Part I at 169 (1973) (“The Commission is also of the opinion that nonpurchase-money security interests should not be enforceable as to items of property essential to a debtor’s well-being, such as wearing apparel, which are of little or no value to a creditor, other than as a means of coercing repayment.”); H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 127, reprinted in [1978] 5 U.S.Code Cong. & Ad.News 6088 (“In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor’s hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors’ true intentions, are coerced into payments they simply cannot afford to make.”).

. The problem and the split of authority are discussed in In re Cain, 291 F.Supp. 1, 2 (N.D. Texas 1968).

. The alternate branch, represented by Cain itself, treated the creditor as secured, valued the extent of the security interest, enforced any unsecured balance in the bankruptcy court, and continued the security interest in effect beyond the termination of the bankruptcy. This approach corresponds to option (c). For lenders other than those affected by Section 522(f)(2) it continues to be available under Section 522(c) of the new Act. See note 3 supra.

. The substituted rights of an unsecured creditor need not be equal in value to the property allegedly taken. “While these rights may well not have constituted ‘just compensation’ if a ‘taking’ had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on [creditors] and, for that reason, are to be taken into account in considering the impact of the regulation.” Penn Central, supra, 438 U.S. at 137, 98 S.Ct. at 2666.